## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEITH LYLE BAILEY individually and as Trustee of the EFFIE BAILEY LAND TRUST, on behalf of themselves and all others similarly situated,<br><br><br>Plaintiff,<br><br>v.<br><br>BAYER CROPSCIENCE LP, BAYER CROPSCIENCE, INC.; CORTEVA INC.; CARGILL INCORPORATED; BASF CORPORATION; SYNGENTA CORPORATION; WINFIELD SOLUTIONS, LLC; UNIVAR SOLUTIONS, INC.; PIONEER HI-BRED INTERNATIONAL, INC.; FEDERATED CO-OPERATIVES LTD.; CHS INC.; NUTRIEN AG SOLUTIONS INC.; GROWMARK INC.; SIMPLOT AB RETAIL SUB, INC.; and TENKOZ INC.,<br><br><br>Defendants. | Case No. 3:21-CV-00512<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

I.   NATURE OF THE ACTION ................................................................. 1

II.  JURISDICTION AND VENUE ............................................................ 4

III. PARTIES ................................................................................................. 5

      A.   Plaintiff. ......................................................................................... 5

      B.   The Manufacturer Defendants. .................................................... 5

      C.   The Wholesaler Defendants. ........................................................ 6

      D.   The Retailer Defendants. .............................................................. 7

IV.  TRADE AND COMMERCE ................................................................. 9

V.   THE RELEVANT MARKETS ............................................................... 9

VI.  FACTUAL ALLEGATIONS ................................................................. 9

      A.   Industry Background. .................................................................... 9

      B.   The Crop Inputs Market Is Characterized by a Lack of Pricing and Industry Transparency, Which Defendants Capitalize on in Their Business Practices. ..... 10

      C.   The Rise of Electronic Crop Inputs Sales Platforms Threatened Defendants' Operations by Increasing Transparency of Pricing and Access to Crop Inputs. .. 11

      D.   Faced with the Threat of ESPs, Defendants Conspired with One Another to Restrict the ESPs' Ability to Successfully Compete in the Crop Inputs Market.. 12

      E.   The Conspiracy Is Economically Plausible. ............................... 18

            1.   The Crop Inputs Market Is Highly Concentrated. ................... 19

            2.   Defendants Had Many Opportunities to Conspire. ................... 19

            3.   Defendants Are Recidivist Antitrust Violators. ....................... 20

            4.   Defendants' Actions Were Against Their Economic Interests. ................ 20

            5.   Government Investigations ........................................................ 21

VII.   ANTITRUST IMPACT ....................................................................... 22

VIII.  ANTITRUST INJURY ........................................................................ 23

IX. CLASS ACTION ALLEGATIONS ........................................................................ 23

X.  STANDING TO SEEK RELIEF ........................................................................... 25

XI. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ................... 26

XII.    CAUSES OF ACTION .................................................................................... 27

VIOLATION OF THE SHERMAN ACT  COUNT 1: Conspiracy to Restrain Trade in Violation
of § 1 of the Sherman Act (15 U.S.C.A. § 1 (West) ............................................... 27

VIOLATIONS OF STATE ANTITRUST LAWS  COUNT II: Arizona Uniform State Antitrust
Act Ariz. Rev. Stat. Ann. § 44-1401, *et seq.* .......................................................... 29

COUNT III: California Cartwright Act Cal. Bus. & Prof. Code § 16700 (West), *et seq.* ............ 30

COUNT IV: Connecticut Antitrust Act Conn. Gen. Stat. Ann. § 35-24 (West), *et seq.*, ............. 32

COUNT V: Florida Deceptive and Unfair Trade Practices Act Fla. Stat. Ann. § 501.201 (West),
*et seq.* ............................................................................................................... 33

COUNT VI: Hawaii Antitrust Laws Haw. Rev. Stat. Ann. § 480-1 (West), *et seq.* ................... 33

COUNT VII: Illinois Antitrust Act 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.* ........................ 34

COUNT VIII: Iowa Competition Law Iowa Code Ann. § 553.1 (West), *et seq.* ....................... 35

COUNT IX: Kansas Restraint of Trade Act Kan. Stat. Ann. § 50-101 (West), *et seq.* ............... 36

COUNT X: Maine Monopoly & Profiteering Laws Me. Rev. Stat. tit. 10, § 1101, *et seq.* ......... 38

COUNT XI: Maryland Antitrust Laws Md. Code Ann., Com. Law § 11-201 (West), *et seq.* ...... 39

COUNT XII: Michigan Antitrust Reform Act Mich. Comp. Laws Ann. § 445.771 (West), *et seq.*
40

COUNT XIII: Minnesota Antitrust Law of 1971 Minn. Stat. Ann. § 325D.49 (West), *et seq.* ... 41

COUNT XIV: Mississippi Antitrust Laws Miss. Code Ann. § 74-21-1, *et seq.* ......................... 42

COUNT XV: Nebraska Junkin Act Neb. Rev. Stat. Ann. § 59-801 (West), *et seq.* .................... 43

COUNT XVI: Nevada Unfair Trade Practices Act Nev. Rev. Stat. Ann. § 598A.010 (West), *et
seq.* .................................................................................................................... 45

COUNT XVII: New Hampshire Antitrust Statute N.H. Rev. Stat. Ann. Tit. XXXI § 356, *et seq*46

COUNT XVIII: New Mexico Antitrust Act N.M. Stat. Ann. § 57-1-1 (West), *et seq.* ............... 47

COUNT XIX: New York Donnelly Act N.Y. Gen. Bus. Law § 340 (McKinney), *et seq* ........... 48

COUNT XX: North Carolina Antitrust Laws N.C. Gen. Stat. Ann. § 75-1, *et seq.* ..................... 49

COUNT XXI: North Dakota Uniform State Antitrust Act N.D. Cent. Code §§ 51-08.1, *et seq.* 51

COUNT XXII: Oregon Antitrust Law Or. Rev. Stat. Ann. § 646.705 (West), *et seq.* ................. 52

COUNT XXIII: South Dakota Antitrust Statute S.D. Codified Laws § 37-1-3.1, *et seq.* ............ 53

COUNT XXIV: Tennessee Trade Practices Act Tenn. Code Ann. § 47-25-101 (West), *et seq.* . 54

COUNT XXV: Utah Antitrust Act Utah Code Ann. § 76-10-911 (West), *et seq.* ....................... 55

COUNT XXVI: Vermont Consumer Protection Laws Vt. Stat. Ann. tit. 9, § 2451 (West), *et seq.* 56

COUNT XXVII: West Virginia Antitrust Act W. Va. Code Ann. § 47-18-1 (West), *et seq.* ...... 57

COUNT XXVIII: Wisconsin Trade Regulations Wis. Stat. Ann. § 133.01(1) (West), *et seq* ..... 58

PRAYER FOR RELIEF ......................................................................................... 60

DEMAND FOR JURY TRIAL ................................................................................ 60

Plaintiffs KEITH LYLE BAILEY individually and as Trustee of the EFFIE BAILEY LAND TRUST, bring this action on behalf of themselves and on behalf of the Classes defined herein consisting of persons or entities in the United States, including its territories, that, at least as early as January 1, 2014, and continuing through the present (the "Class Period"), purchased from a Defendant a Crop Input as defined herein. Plaintiff brings this action under the antitrust laws of the United States against Defendants, and under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and demand a trial by jury.

## I.    NATURE OF THE ACTION

1.    The American market for "Crop Inputs"—seeds and crop protection chemicals such as fungicides, herbicides, and insecticides—is one of the largest markets in the world with annual sales in excess of $65 billion.

2.    This market is dominated by:

    a.    Four major manufacturers, Defendants Bayer CropScience Incorporated ("Bayer"), Corteva Incorporated ("Corteva"), Syngenta Corporation ("Syngenta") and BASF Corporation ("BASF") (collectively, the "Manufacturer Defendants");

    b.    Three large wholesalers, Defendants Cargill Incorporated ("Cargill"), Winfield Solutions, LLC ("Winfield"), Univar Solutions, Incorporated ("Univar"), that control the distribution of Crop Inputs to farmers; and

    c.    Retailers, including Defendants CHS Incorporated ("CHS"), Nutrien Ag Solutions Incorporated ("Nutrien"), GROWMARK, Incorporated ("Growmark"), Simplot AB Retail Sub, Incorporated ("Simplot"), Tenkoz Incorporated ("Tenkoz"), and Federated Co-operatives Limited ("Federated").

3.      Historically the distribution and sale process for Crop Inputs enables the market participants to maintain supra-competitive prices, in part by denying farmers accurate product/pricing information, which would allow them to make fully-informed purchasing decisions. As a result, the average price American farmers pay for Crop Inputs is increasing at a rate that dramatically outpaces yields.

4.      For example, over the last 20 years, the price of seed corn rose 300%, while corn yields increased only 33% to 35%. In 1989, U.S. farms spent $15.6 billion overall on chemicals, fertilizer, and seeds. This rose to $59 billion in 2019, outpacing inflation by 60%.  As a result, Crop Inputs have increasingly constituted a larger share of farm budgets. In 1989, Crop Inputs constituted 12.6% of farm expenditures; by 2019, Crop Inputs constituted 16.4% of farmer spending. These increases are proving devastating to farmers, who currently occupy the least profitable level of the American food supply chain. Farmers are being forced into bankruptcy at a record pace.

5.      Recognizing these inefficiencies, several electronic sales platforms (ESPs) were launched in the past decade to service the Crop Inputs market. These ESPs aimed to provide a cheaper, more transparent way for farmers to buy Crop Inputs, circumventing the existing opaque, convoluted distribution system. For example, Farmers Business Network ("FBN"), a leading ESP and Silicon Valley startup, was extremely popular with farmers upon launch and has successfully raised millions of dollars from leading venture capital firms to build out capacity to meet that demand.

6.      These new platforms threatened the Defendants' dominant market positions and control over pricing.   Rather than compete fairly with the ESPs, Defendants, wholesalers, and retailers conspired to block the ESPs' access to Crop Inputs by engaging in a group boycott. For

instance, the Manufacturer Defendants, and the Wholesalers, and Retailers repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN, even though doing so would have opened a significant new sales channel and in the best economic interests for any of them acting independently.

7.    The Manufacturer Defendants ensured the success of the boycott by imposing strict penalties on retailers who made sales to FBN. Similarly, certain manufacturers audited authorized retailers to make sure that ESPs were not securing branded Crop Inputs by buying from an authorized retailer.

8.    When FBN attempted to circumvent this unlawful boycott by purchasing an established retailer with existing supply agreements, Defendants canceled the retailer's existing supply contracts, starving FBN's platform of the Crop Inputs it needed to operate.

9.    Given the structure of the Crop Inputs industry, with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual agreement, coordination, and cooperation of all three groups.   Absent such an agreement, Defendants' actions were against their independent economic self-interests.

10.    In early 2020, it was revealed that Canada's Competition Bureau ("CCB") has been investigating this conduct. Documents filed by CCB, indicate that Defendants refused to supply, or restricted supply, of Crop Inputs to FBN and engaged in coordinated behavior in relation to FBN. The United States Department of Justice is reportedly monitoring CCB's investigation.

11.    As a result of Defendants', retailers', and wholesalers' misconduct, farmers remain trapped in an inefficient, opaque Crop Inputs market and have paid more for Crop Inputs

than they would have in a competitive market. Plaintiff and the Classes bring this antitrust suit to redress that wrongful conduct.

## II.    JURISDICTION AND VENUE

12.    Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C.A. § 26 (West), to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West), and to recover actual and compensatory damages, treble damages, interest, costs, and attorneys' fees for the injury caused by Defendants' wrongful conduct. Plaintiffs also bring state law class claims on behalf of the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post- judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct.

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.A. § 1331 and 1337(a) and Sections 4 and 16 (West) of the Clayton Act, 15 U.S.C.A. § 15(a) and 26 (West). This Court also has jurisdiction under 28 U.S.C.A. § 1332 (West) because the amount in controversy for each Class exceeds $5,000,000 and members of each Class are citizens of a different state than Defendants.

14.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C.A. § 15(a), and 28 U.S.C.A. § 1391(b), (c), and (d) (West). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

15.    This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Crop Inputs throughout the United States, including in this District; (c) had substantial contacts with the

- 4 -

United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

16.     The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.    PARTIES

**A.    Plaintiff.**

17.     Plaintiffs, KEITH LYLE BAILEY individually, and as Trustee of the EFFIE BAILEY LAND TRUST, are residents of the state of Illinois, and the county of Jasper.  During the Class Period, Plaintiffs purchased Endogen corn seed, a Syngenta product, as well other crop inputs including fungicides and herbicides at a supra-competitive price from retailer defendant Nutrien, AG.

**B.    The Manufacturer Defendants.**

18.     BAYER AG is a multinational agricultural, pharmaceutical, and chemical company. It is organized into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

19.     Defendant Bayer CropScience Incorporated is a wholly-owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States.

20.    DEFENDANT BAYER CROPSCIENCE LP is a wholly-owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

21.    Bayer CropScience Incorporated and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

22.    Defendant CORTEVA INCORPORATED is a Delaware corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

23.    Defendant Pioneer Hi-Bred International, Inc. is an Iowa corporation headquartered in Johnston, Iowa, that develops, manufactures, and sells Crop Inputs in the United States. Pioneer is a wholly-owned subsidiary of Manufacturer Defendant Corteva Incorporated.

24.    Defendant BASF CORPORATION is a Delaware corporation headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

25.    Defendant Syngenta Corporation is a Delaware corporation and is the main U.S.-based operating subsidiary of Syngenta AG. It is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

**C.    The Wholesaler Defendants.**

26.    CARGILL is a Delaware corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to other retailers. Cargill's AgResource Division maintains contracts

- 6 -

with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded
Crop Inputs and entitling it to special rebates.

27.     WINFIELD SOLUTIONS, LLC is a Delaware corporation headquartered in
Arden Hills, Minnesota. Winfield is a Crop Inputs wholesaler. It maintains contracts with each of
Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop
Inputs and entitling it to special rebates. Winfield is also a major Crop Inputs retailer that
operates as a cooperative owned by its members, which are 650 Crop Inputs retail businesses
operating 2,800 retail locations throughout the United States and parts of Canada.

28.     UNIVAR SOLUTIONS, INCORPORATED is a Crop Inputs wholesaler. Univar
maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase
and distribute branded Crop Inputs and entitling it to special rebates. Univar is a domestic
corporation headquartered in Illinois and incorporated in Delaware.

**D.     The Retailer Defendants.**

29.     CHS INCORPORATED is one of the largest Crop Inputs wholesalers in the
United States. Like many large wholesalers, it also operates retail networks bearing the CHS
brand around the country that sell Crop Inputs from brick-and-mortar stores. CHS is incorporated
and headquartered in Inver Grove Heights, Minnesota.

30.     CHS and the retail networks it operates maintain contracts with each of Bayer,
Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling
it to special rebates.

31.     NUTRIEN AG SOLUTIONS, INC. is both a Crop Inputs wholesaler and the
largest Crop Inputs retailer in the United States. It sells Crop Inputs to farmers throughout the
country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it

to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien is incorporated in Delaware and has its principal place of business in Colorado.

32.     GROWMARK, INCORPORATED, d/b/a Farm Supply or FS, is a large Crop Inputs retailer headquartered in Illinois, with brick-and-mortar locations throughout the Midwestern United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

33.     TENKOZ INC. is one of the largest Crop Inputs retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

34.     SIMPLOT AB RETAIL SUB, INCORPORATED, f/k/a Pinnacle Agriculture Distribution, Incorporated, is a large Crop Inputs wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

35.     FEDERATED CO-OPERATIVES LTD. is a large Crop Inputs retailer.  It maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in anticompetitive practices in the Crop Inputs market.

- 8 -

## IV.    TRADE AND COMMERCE

36.    Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

37.    During the Class Period, Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## V.    THE RELEVANT MARKETS

38.    This action involves the markets for Crop Inputs, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

39.    The relevant geographic market is the United States.

## VI.    FACTUAL ALLEGATIONS

### A.    Industry Background.

40.    Farmers in the United States are facing an existential crisis, with operating expenses skyrocketing while yields remain stagnant. At their peak prices in 2014, input costs jumped 67.5% for planting soybeans, 72.1% for planting corn, and 56.3% for planting cotton, compared to the respective input costs in 1995, while yields for soybeans and corn—the two most planted field crops in the United States—increased by only 18.9% and 29.7%, respectively, between 1995 and 2011. Indeed, since 1996, total production costs of corn have nearly doubled.

41.    In a 2018 survey, 80% of farmers reported that their costs continued to increase, and many farmers cannot pay their outstanding operating debts—estimated at well over $400 billion in 2019. The rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

42.    This steady cost increase is not attributable to escalating research and development expenditures, which have in fact decreased considerably. Rather, it is the result of unjustifiable increases in the prices farmers pay for Crop Inputs—the seeds and chemicals such

- 9 -

as fertilizer, insecticide, and herbicide used to produce a crop—and the supra-competitive prices paid by farmers as a result of Defendants' wrongful conduct, including but not limited to their group boycott of electronic distribution platforms.

**B.    The Crop Inputs Market Is Characterized by a Lack of Pricing and Industry Transparency, Which Defendants Capitalize on in Their Business Practices.**

43.    These inflated prices persist—and wreak financial havoc on America's farmers—by Defendants' design. The Crop Inputs market is structured, from top to bottom, to maximize opacity and deny farmers access to the objective pricing data and product information they need to make informed decisions about Crop Inputs purchases. Farmers are unwittingly paying more for Crop Inputs than they would in a truly competitive market. Farmers lack the objective information and data needed to gauge whether their investments are worthwhile, as well as any ability to purchase Crop Inputs without paying unnecessary overhead to brick-and-mortar retailers and other costs.

44.    This opacity begins at the top of the Crop Inputs market, where the Manufacturer Defendants, who closely guard their prices, develop and produce between 75% and 90% of the most popular Crop Inputs.

45.    To maintain that secrecy, Manufacturer Defendants allow only wholesalers, including the Wholesaler Defendants, retailers the manufacturers own or operate, and retailers such as the Retailer Defendants that are licensed "authorized retailers" to sell the Manufacturer Defendants' Crop Inputs.

46.    The Manufacturer Defendants' contracts granting "authorized retailer" licenses contain strict confidentiality provisions that require, *inter alia*, authorized retailers to keep confidential the manufacturers' prices, as well as any incentives, rebates, and commissions.

- 10 -

47.     Manufacturer Defendants also use a tactic known as "seed relabeling" to capitalize on farmers' lack of objective performance data. Seed relabeling is the practice of taking seeds that have been on the market under a given brand name for some time and repackaging the seeds under a new brand name so that they can be sold at a higher price, even though the seeds are the same.

48.     Pricing is no more transparent at the retail level. Wholesalers' contracts with authorized retailers also contain strict confidentiality provisions. Retailers cannot disclose to customers the price paid to the wholesaler for their Crop Inputs or the price at which retailers sell those Crop Inputs to other farmers. To further muddy the market waters, retailers sell Crop Inputs and related services (e.g., spraying or applying chemicals) in bundles, making it difficult—if not impossible—for farmers to discern the price they are charged for any individual Crop Input or service.

**C.     The Rise of Electronic Crop Inputs Sales Platforms Threatened Defendants' Operations by Increasing Transparency of Pricing and Access to Crop Inputs.**

49.     Recognizing the inefficiency of an opaque Crop Inputs market, electronic Crop Inputs sales platforms began emerging in the past decade with the goal of modernizing the market by, among other things, providing farmers with transparent pricing and access to Crop Inputs directly from the Manufacturer Defendants, avoiding the opaque distribution system controlled by the Wholesaler and Retailer Defendants.

50.     At first, those efforts showed extraordinary promise, as farmers gravitated *en masse* toward these electronic platforms in search of better, fairer prices. More than 12,000 farmers signed up for FBN's service that provides objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic platform that was designed to sell Crop Inputs online. FBN overall has over 21,000 members, and most recently raised $250 million in Series F

funding to continue its efforts "to improve the profitability of farming families . . . for generations to come."

51.      The success of electronic platforms drew negative attention from the Wholesaler and Retailer Defendants, who recognized that these new entrants threatened not only their traditional roles in the Crop Inputs market but also their profit margins. FBN as an example particularly stands out because of its popularity and potential to significantly disrupt traditional Crop Inputs supply and pricing.

52.      A report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major lender to grain cooperatives, explained: "Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices." That price transparency would allow farmers to negotiate more effectively with Crop Inputs retailers, thus eating into the retailers' margins.

**D.      Faced with the Threat of ESPs, Defendants Conspired with One Another to Restrict the ESPs' Ability to Successfully Compete in the Crop Inputs Market.**

53.      Upon learning about FBN's 2016 entry into the U.S. market as an electronic Crop Inputs sales platform, CHS officials distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that although an electronic platform like FBN would be able to offer the same products at cheaper prices: "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

54.      Additionally, in 2016, Defendant Bayer secretly formed an internal task force specifically to study the long-term competitive impact of FBN's electronic platform.

- 12 -

55.     On February 2, 2016, CropLife magazine, a trade publication published by CropLife America (a trade association composed of the major Crop Inputs manufacturers, wholesalers, and retailers), echoed CoBank's sentiments, and wrote repeatedly about the danger electronic platforms posed to Crop Inputs retailers' business model. CropLife stated that it was "concerned that the retailer could be disintermediated—a fancier and less draconian way of saying [electronic platforms would] 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried "the devil known as 'price transparency,'" commenting that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

56.     In the same February 2, 2016 article, CropLife magazine criticized another electronic platform, XSAg.com (currently known as FarmTrade, LLC or FarmTrade.com), one of the original electronic platform trailblazers that had launched to offer "a virtual playing field" for the purchase and sale of certain Crop Inputs electronically, essentially operating as a trading platform. CropLife described XSAg's entry as a "punch [that] came out of the shadows and landed a nasty body blow" to threatened retailers, further noting that "[c]rop protection manufacturers and the distribution channel eventually figured out how to do battle with the pricing revelations XSAg brought to the market, but it was [an] unnerving and unhappy time."

57.     In late fall 2017, CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—explicitly called out the threat posed by electronic platforms to retailers and wholesalers at its annual meeting. CropLife's coverage of the event reported that "three letters… continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers

- 13 -

Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their businesses during 2017 by cutting into their already slim margins on various products." One PACE Council member observed, "I think it would be crazy, stupid to ignore [FBN]. Even if they end up going away, the business model they've introduced to agriculture will probably be tried by someone else."

58.     In February 2018, CropLife reported on a local "huge price war in chemicals" in Iowa in 2017 as a result of FBN competing in the market. A retailer competing with FBN urged that "'ag retailers need to get proactive' in dealing with the threat of disintermediation." Another retailer noted that "as we get more competitive with the FBNs of the world, we'll obviously have to cut back on services and support (at times). But what concerns me is when . . . the legal implications of that are you are a big business now and the regulatory burden becomes more significant."

59.     Defendants had a strong motive to conspire to preserve their opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep their prices confidential or maintain price opacity through seed relabeling and bundling.

60.     The Retailer Defendants and the Wholesaler Defendants, to retain their dominant market positions and supracompetitive profit margins, had to exclude electronic platforms from the market. They conspired to cut off the platforms' product supply. Because the Manufacturer Defendants rely on the Retailer and Wholesaler Defendants to recommend and sell the Manufacturer Defendants' products to farmers, the Retailer and Wholesaler Defendants had to

convince the Manufacturer Defendants to agree not to supply FBN and other platforms in order to make the boycott effective.

61.     Subsequently, starting in 2016, after FBN entered the market, the Manufacturer Defendants complied with the Retailer and Wholesaler Defendants' demands and initiated a joint boycott of electronic platforms, including FBN, the target of CropLife's report. As a result, when FBN reached out to the Manufacturer and Wholesaler Defendants for Crop Inputs, they refused to supply FBN, offering pretextual excuses for their refusal.

62.     For example, in fall 2018, after Syngenta's Head of Crop Protection Sales in the U.S. learned that a small number of branded Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott, he falsely claimed that electronic platforms would deliver counterfeit products. He further claimed that "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

63.     The Manufacturer Defendants refused to supply seed and pesticide products to FBN and did not allow the electronic platform to sell products crucial to the U.S. Farm Belt, such as Syngenta's Force insecticide and Corteva's Pioneer corn seed.

64.     To ensure that their boycott was successful, Defendants imposed strict penalties on retailers who failed to comply. For example, in March 2018, after learning that some retailers had sold seed and spray products to FBN despite the boycott, Syngenta initiated an audit of its authorized retailers and brokers to identify and punish those that had made the sales. Syngenta's Head of U.S. Crop Protection Sales wrote to sellers, "We have concerns about product integrity, stewardship, and regulatory compliance."

65.     Bayer, BASF, and Corteva similarly include mandatory language in their form contracts with authorized retailers that allows them to audit authorized retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to ensure that electronic platforms could not secure branded Crop Inputs by buying from an authorized retailer.

66.     This backlash extended to generic products (Crop Inputs that no longer retain patent protection). A June 2018 Forbes article reported that some generic chemical products manufacturers were holding back on supplying FBN because they are "wary of angering their existing sales channels [i.e., wholesalers and retailers]." One generic products manufacturer CEO confirmed that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."

67.     FBN has attempted to circumvent Defendants' boycott in the U.S. by relying on brokers, who sometimes have excess inventory to offload, in order to obtain name-brand Crop Inputs to sell to American farmers. However, obtaining such inventory often comes at higher costs than those paid by other retailers that are able to buy directly from manufacturers—which inhibited FBN's ability to effectively bring price competition to the sector.

68.     On March 27, 2018, in an attempt to combat Defendants' boycott, FBN announced its purchase of Yorkton Distributors Ltd. ("Yorkton"), a Canada-based retailer with decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. These agreements, if honored, would have provided FBN with Crop Inputs inventory which it could sell to farmers at competitive prices.

69.     Before purchasing Yorkton, FBN asked manufacturers whether they would continue to supply Yorkton with their products if FBN purchased it, and "no one indicated they'd be disfavorable."

70.     Yet after FBN's purchase, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they continued supplying Crop Inputs to Yorkton. On March 31, 2018, four days after FBN announced its purchase of Yorkton, Federated warned that the new competitor would upend their business models, writing, "How our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada."

71.     Less than a week later, on April 6, 2018, Univar emailed retailers saying that it would refuse to supply its products to Yorkton or FBN, and warning that the new competition would decrease profit margins in the industry. Univar had informed FBN that Univar would no longer conduct business with the company beyond July 31, 2018, warning retailers, in part: "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing If anyone thinks socialism is going to feed the world[,] just call Russia first and see how that worked out." Univar further criticized FBN's business model of bringing market transparency to farmers, declaring that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."

72.     Faced with threats of retaliation from wholesalers and retailers, the Manufacturer Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within months of its March 2018 acquisition by FBN, causing Yorkton to lose two-thirds of its

branded products. Bayer, Corteva, and Cargill informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, to Yorkton.

73.     Like Defendants' boycott in the U.S., Defendants' boycott in the Canadian market was also successful. FBN was forced to lease Yorkton to a Canadian retailer to balance its large investment losses, although Yorkton continues to face boycotts by its former suppliers because of FBN's ownership. In July 2020, after being unable to compete effectively in the U.S. and Canadian Crop Inputs market due to Defendants' collusive conduct, FBN acquired an Australian electronic platform in an effort to compete in the Australian Crop Inputs market.

74.     In the U.S., FBN has been unable to sell name-brand Crop Inputs with the exception of occasional excess products purchased from brokers. As a result, FBN is only able to rely on suppliers of generic Crop Inputs, but many farmers have concerns about generic products' quality and will not purchase generics. Additionally, the effect of Defendants' wrongful conduct has extended into the generic market, further stifling FBN's options. FBN, starved of Crop Inputs, has since begun developing its own products, including seeds, herbicides, and insecticides, to sell to farmers through its electronic platform. Due to Defendants' conduct, FBN, as of August 2020, has yet to turn a profit.

75.     As a result of the Retailer, Wholesaler, and Manufacturer Defendants' coordinated actions, farmers were deprived of the opportunity to purchase Crop Inputs at transparent, lower prices from electronic platforms. Instead, they are forced to continue paying artificially high prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements.

**E.     The Conspiracy Is Economically Plausible.**

76.     Defendants' actions took place in the context of multiple plus factors that facilitated their conspiratorial agreement.

- 18 -

1.    **The Crop Inputs Market Is Highly Concentrated.**

77.    The market for Crop Inputs is highly concentrated. BASF, Corteva, Syngenta, and

Bayer AG dominate production in virtually every Crop Inputs category because they hold the

patents for the genetic traits and crop protection chemicals that work best with popular branded

seeds. As a result, they control 85% of the corn seed market, more than 75% of the soybean seed

market, and over 90% of the cotton seed market. The wholesale market is just as concentrated,

with seven wholesalers accounting for 70% of all sales volume.

2.    **Defendants Had Many Opportunities to Conspire.**

78.    Defendants had numerous opportunities for inter-firm communications to form

and maintain their conspiracy through trade association participation.

79.    CropLife America is a trade association that comprises major Crop Inputs

manufacturers, wholesalers, and retailers. CropLife's Board of Directors meets annually to

discuss developments in the Crop Inputs market and has specifically discussed the entry of

electronic platforms.

80.    CropLife's Board of Directors is chaired by an executive from one of the

Manufacturer Defendants—currently BASF's Paul Rea, and previously Corteva's Suzanne

Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from

Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. Although CropLife America's long-

time CEO claims that "the work of our Board of Directors is imperative to making sure that

farmers have access to crop protection technology today and, in the future," there is not a single

representative from farming groups on CropLife America's Board of Directors. Instead, the

Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers,

distributors, and retailers, making it an ideal vehicle for collusion. No farming representatives are

allowed to participate.

81.     The Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. Multiple employees from Defendants currently serve on the ARA Board, including Rod Wells, the current Board Chairman and the Chief Supply Chain Officer of Defendant GROWMARK. Notably, every single one of the Manufacturer Defendants was a "Platinum Sponsor"—the highest level sponsorship—at the 2019 annual conference (held in December 2019, shortly before such conferences were suspended due to COVID-19). These industry conferences provide ample opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

### 3.     Defendants Are Recidivist Antitrust Violators.

82.     Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which BASF and Bayer are among the top five leading antitrust recidivists. Corteva is also on the list and is among the top forty leading antitrust recidivists.

### 4.     Defendants' Actions Were Against Their Economic Interests.

83.     Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott could only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary

supplier to electronic platforms and grown its customer base at the expense of its competitors by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

84.     For these reasons, absent an agreement among them, Defendants' actions were against their independent economic self-interest. For any one or more Defendants to provide Crop Inputs to electronic platforms presented a significant business opportunity because those platforms: (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by reducing or eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

### 5.    Government Investigations

85.     Most recently, Defendants' exclusion of FBN drew the attention of Canada's Competition Bureau ("CCB"), which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets. The CCB is investigating whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

86.     In the course of the CCB investigation, on February 11, 2020, a Canadian federal court granted in full ex-parte applications made by Canada's Commissioner of Competition for

the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices.

87.    Critically, and over Defendants' objections, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well. In January 2021, CCB filed an application seeking an order requiring three Bayer CropScience employees to be examined under oath or solemn affirmation by the Commissioner of Competition.

88.    The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs. The Federal Trade Commission ("FTC") is also investigating anticompetitive conduct in the Crop Inputs market and issued a subpoena to at least one defendant, Corteva. Corteva confirmed in a 10-Q filing that the FTC subpoenaed it "to submit documents pertaining to its crop protection products generally, as well as business plans, rebate programs, offers, pricing and marketing materials specifically related to its Acetochlor, Oxamyl and Rimsulfuron and other related products in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## VII.    ANTITRUST IMPACT

89.    Defendants' conduct has substantially impaired competition in the retail sale market for Crop Inputs by excluding electronic platforms, including FBN, from competing in that market.

90.    Defendants' conduct in boycotting and preventing ESPs from competing in the retail sales market for Crop Inputs lacks any procompetitive justification. Moreover, the harm to

competition and the resulting antitrust injury—suffered by both farmers and other consumers of Crop Inputs—more than offsets any procompetitive justifications Defendants may offer.

## VIII.  ANTITRUST INJURY

91.    Plaintiffs and Class Members have suffered antitrust injury as a direct result of Defendants' unlawful conduct.

92.    By impairing competition in the retail sales market for Crop Inputs, and by excluding ESPs from competing in that market, Defendants have artificially raised the prices paid by purchasers for Crop Inputs to supracompetetive levels.

## IX.    CLASS ACTION ALLEGATIONS

93.    Plaintiff brings this action individually and on behalf a class of all those similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b), and defined as:

A.    All persons or entities residing in the United States, including its territories, from at least as early as January 1, 2014, and continuing through the present (the "Class Period"), that purchased from a Defendant a Crop Input manufactured by a Manufacturer Defendant; and

B.    All persons or entities residing in the United States, including its territories, that, during the Class Period, purchased from a retailer other than a Retailer Defendant a Crop Input manufactured by a Manufacturer Defendant.

94.    Excluded from the Classes are Defendants; their officers, directors, management, employees, subsidiaries, affiliates, and coconspirators; and any persons or entities that purchased Crop Inputs solely for resale to others. Also excluded are any federal, state, or local governmental entities, any judicial officers presiding over this action; their law clerks and spouses; any persons within three degrees of relationship to those living in the judicial officers' household; and the spouses of all such persons.

95.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

96.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Defendants.

97.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of members of the Classes.

98.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions involving group boycotts and conspiracy claims.

99.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

      a.    Whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

      b.    Whether Defendants conspired to unreasonably restrain trade in violation of state unfair competition and antitrust laws;

      c.    The scope and duration of the alleged conspiracy;

      d.    Injury suffered by Plaintiffs and members of the Classes;

      e.    Damages suffered by Plaintiffs and members of the Classes; and

      f.    Whether Defendants have acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

100.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

101.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

102.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

103.    Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Classes, including, without limitation, the Class Period.

## X.    STANDING TO SEEK RELIEF

104.    Plaintiff and the members of the Classes have purchased directly from a participant in the conspiracy in restraint of trade between the Manufacturer and Wholesaler Defendants and their Retailer Defendant co-conspirators, or from an authorized retailer that is in the control of the Manufacturer and Wholesaler Defendants by virtue of the terms of the authorized-retailer licenses dictated by the Manufacturer Defendants. As a consequence, the members of the Classes have standing to pursue damages inflicted by the conspiracies under U.S. Const. art. III and Section 4(a) of the Clayton Act, 15 U.S.C.A. § 15(a) (West).

- 25 -

105.    By engaging in the conspiracy alleged in this Complaint, the Manufacturer Defendants, Wholesaler Defendants, and Retailer Defendants have maintained a market structure that benefits each of them at the expense of farmers such as Plaintiff and members of the class. As the first purchasers injured by Defendants' anticompetitive conduct, Plaintiffs and the members of the Classes have standing as direct purchasers under Section 4(a) of the Clayton Act, 15 U.S.C.A. § 15(a) (West).

106.    The Plaintiff and members of the Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C.A. § 26 (West), because the conspiracies have inflicted or threatened to inflict harm on them, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

107.    The Plaintiff and members of the Classes also have standing to seek declaratory relief under 28 U.S.C.A. § 2201 and 2202 (West) because there is an actual, present, and justiciable controversy that has arisen between members of the Classes and all Defendants concerning whether Defendants and other co-conspirators have conspired in restraint of trade.

## XI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

108.    Any applicable statute of limitations for Plaintiff and the Classes has been tolled with respect to any claims and rights of action that Plaintiff and the Classes have as a result of the unlawful combination and conspiracy alleged in this Complaint. Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' and their co-conspirators' concealment of the conspiracy.

109.    Plaintiff and the Classes were not placed on actual or constructive notice of the conspiracy alleged herein until CCB made public its investigation and issued its subpoenas. More specifically, CCB's investigation made public allegations that Defendants refused to supply FBN with Crop Inputs and/or engaged in communications that are suggestive of

coordinated behavior in relation to FBN. Group boycotts and other antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the Classes.

110.    As discussed above, the Crop Inputs market, from top to bottom, is structured to maximize opacity and deny purchasers access to the objective pricing data and product information farmers need to make informed decisions about the Crop Inputs they purchase. Further, the Manufacturer Defendants, Retailer Defendants, and Wholesaler Defendants use confidentiality provisions in their contracts to obscure and restrict disclosure of Crop Inputs prices. Defendants use additional tactics such as seed relabeling and bundle sales to further muddy the market waters and prevent farmers, including Plaintiffs and the Classes, from learning about the Crop Inputs market.

111.    Plaintiff and the Classes could not have uncovered Defendants' conspiracy through the exercise of reasonable diligence. For one, Plaintiff and the Class do not have visibility into Defendants' pricing nor their distribution contracts which contain significant pricing-related terms. Additionally, Plaintiffs and the Class are not members of the various boards and executive committees where the issues surrounding this complaint were discussed amongst Defendants.

## XII.    CAUSES OF ACTION

### VIOLATION OF THE SHERMAN ACT

### COUNT 1: Conspiracy to Restrain Trade
### in Violation of § 1 of the Sherman Act (15 U.S.C.A. § 1)

112.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

- 27 -

113.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs in the United States, in violation of Section I of the Sherman Act, 15 U.S.C.A. § 1 (West).

114.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs that Defendants sold to Plaintiffs and members of the Classes, principally but not exclusively, by jointly boycotting entities that would have introduced price-reducing electronic purchasing of Crop Inputs in the United States.

115.    This conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1 (West).

116.    Alternatively, this conspiracy is a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

117.    Plaintiff and members of the Classes directly purchased Crop Inputs from Defendants and their co-conspirators at supra-competitive prices, suffering antitrust injury and

damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

118.    Plaintiff and members of the Classes have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C.A. § 15 (West).

119.    Plaintiff and members of the Classes are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C.A. § 26 (West).

120.    Plaintiff and members of the Classes are entitled to recover for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

### COUNT II: Arizona Uniform State Antitrust Act
### Ariz. Rev. Stat. Ann. § 44-1401, *et seq.*

121.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

122.    The Arizona Uniform State Antitrust Act prohibits any contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within the state of Arizona.

123.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Crop Inputs market, a substantial part of which occurred within Arizona.

124.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce, for the purpose of excluding competition or controlling, fixing or maintaining prices in the Crop Inputs market.

125.    Defendants' violations of Arizona law were flagrant.

126.    Defendants' unlawful conduct and practices have substantial anticompetitive effects on Arizona's trade and commerce, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

127.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Classes who purchased Crop Inputs in Arizona were injured in their business or property in a manner that the Arizona Uniform State Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Arizona have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## COUNT III: California Cartwright Act
### Cal. Bus. & Prof. Code § 16700 (West), *et seq.*

128.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

129.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code § 16700-16770 (West), governs antitrust violations in California. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace.

130.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

131.    Members of the Classes purchased Crop Inputs within the state of California during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

132.    Defendants enacted a combination of capital, skill, or acts for the purpose of creating and carrying out restrictions in trade or commerce or to prevent market competition in violation of Cal. Bus. & Prof. Code § 16700 (West) *et seq.*

133.    Defendants' unlawful conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

134.    Members of the Classes who purchased Crop Inputs in California were injured in their business or property by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in California have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in California are also entitled to all other forms of relief, including treble damages, interest, and reasonable attorneys' fees and costs.

## COUNT IV: Connecticut Antitrust Act
## Conn. Gen. Stat. Ann. § 35-24 (West), *et seq.*,

135.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

136.     The Connecticut Antitrust Act "expresses a public policy of promoting competition in the marketplace and prohibiting unreasonable restraints of trade, monopolies and attempts to monopolize a defined marketplace."

137.     Members of the Classes purchased Crop Inputs within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

138.     Defendants made contracts or engaged in a combination or conspiracy with one another, for the purpose of fixing, controlling, or maintaining prices for Crop Inputs, sold in Connecticut in violation of Conn. Gen. Stat. Ann. § 35-24 (West), *et seq.*

139.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Connecticut, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

140.     Members of the Classes who purchased Crop Inputs in Connecticut were harmed by Defendants' anticompetitive conduct in a manner that the Connecticut Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Connecticut have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Connecticut are also entitled to all other forms of relief, including treble damages and reasonable attorneys' fees and costs.

- 32 -

## COUNT V: Florida Deceptive and Unfair Trade Practices Act
## Fla. Stat. Ann. § 501.201 (West), *et seq.*

141.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

142.    Defendants' acts and practices detailed above constitute unfair methods of competition and unconscionable acts or practices under and violate Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 (West), *et seq.*

143.    Defendants' conduct and practices have substantial anticompetitive effects in Florida, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

144.    Members of the Classes who purchased Crop Inputs in Florida were harmed by Defendants' anticompetitive conduct in a manner that Florida's laws governing deceptive and unfair trade practices were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Florida have suffered and continue to suffer damages and irreparable injury as a direct proximate result of Defendants' conduct, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## COUNT VI: Hawaii Antitrust Laws
## Haw. Rev. Stat. Ann. § 480-1 (West), *et seq.*

145.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

146.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Haw. Rev. Stat. Ann. § 480-1 (West), *et seq.*

147.    Defendants' unlawful conduct and practices have substantial anticompetitive effects on Hawaii's commerce and consumers, including increased prices and costs, reduced

innovation, poorer customer service, and lowered output. Members of the Classes who purchased Crop Inputs in Hawaii were deprived of free and open competition and paid supra-competitive, artificially inflated prices for Crop Inputs.

148.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes who purchased Crop Inputs in Hawaii were injured in their business or property in a manner that Hawaii's antitrust laws were intended to prevent when they paid more for Crop Inputs than she would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Hawaii have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### COUNT VII: Illinois Antitrust Act
### 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

149.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

150.    The Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade."

151.    Members of the Classes purchased Crop Inputs within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

152.    Defendants made contracts or engaged in a combination or conspiracy with one another, for the purpose of fixing, controlling, or maintaining prices for Crop Inputs, sold in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

153.    Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the market for Crop Inputs in Illinois for the purpose of excluding competition in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

154.    Defendants' unlawful conduct and practices have substantial anticompetitive effects on Illinois's trade and commerce, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

155.    Members of the Classes who purchased Crop Inputs in Illinois were harmed by Defendants' anticompetitive conduct in a manner that the Illinois Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Illinois suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Illinois are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT VIII: Iowa Competition Law
### Iowa Code Ann. § 553.1 (West), *et seq.*

156.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

157.    The Iowa Competition Law aims to "prohibit [] restraint of economic activity and monopolistic practices."

158.    Members of the Classes purchased Crop Inputs within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

159.    Defendants contracted, combined, or conspired to restrain or monopolize trade in the market for Crop Inputs, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing, or maintaining prices for Crop Inputs, in violation of Iowa Code Ann. § 553.1 (West), *et seq.*

160.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

161.    Members of the Classes who purchased Crop Inputs in Iowa were harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Iowa have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Iowa are also entitled to all other forms of relief, including actual damages, exemplary damages for willful conduct, and reasonable attorneys' fees and costs.

## COUNT IX: Kansas Restraint of Trade Act
### Kan. Stat. Ann. § 50-101 (West), *et seq.*

162.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

163.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state."

164.    Members of the Classes purchased Crop Inputs within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

165.    Defendants combined capital, skill, or acts for the purpose of creating restrictions in trade or commerce of Crop Inputs, increasing the price of Crop Inputs, preventing competition in the sale of Crop Inputs, and precluded free and unrestricted competition among themselves in the sale of Crop Inputs, in violation of Kan. Stat. Ann. § 50-101 (West), *et seq.*

166.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in Kansas, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

167.    Members of the Classes who purchased Crop Inputs in Kansas were harmed by Defendants' anticompetitive conduct in a manner that the Kansas Restraint of Trade Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Kansas have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Kansas are also entitled to all other forms of relief, including actual damages and reasonable attorneys' fees and costs.

**COUNT X: Maine Monopoly & Profiteering Laws**
**Me. Rev. Stat. tit. 10, § 1101, *et seq.***

168.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

169.     Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade.

170.     Members of the Classes purchased Crop Inputs within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

171.     Defendants contracted, combined, or conspired in restraint of trade or commerce of Crop Inputs within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of Crop Inputs within the intrastate commerce of Maine, in violation of Me. Rev. Stat. tit. 10, § 1101, *et seq.*

172.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Maine, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

173.     Members of the Classes who purchased Crop Inputs in Maine were harmed by Defendants' anticompetitive conduct in a manner that Maine's monopoly and profiteering laws were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Maine have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the

Classes who purchased Crop Inputs in Maine are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT XI: Maryland Antitrust Laws
### Md. Code Ann., Com. Law § 11-201 (West), *et seq.*

174.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

175.    Maryland's antitrust laws prohibit inter alia, combinations that unreasonably restrain trade or commerce, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

176.    Members of the Classes purchased Crop Inputs within the state of Maryland during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial. Defendants' unlawful conduct and practices have substantial anticompetitive effects in Maryland, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

177.    Members of the Classes who purchased Crop Inputs in Maryland were harmed by Defendants' anticompetitive conduct in a manner that the Maryland antitrust laws were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Maryland suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Maryland are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XII: Michigan Antitrust Reform Act
### Mich. Comp. Laws Ann. § 445.771 (West), *et seq.*

178.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

179.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act."

180.    Members of the Classes purchased Crop Inputs within the state of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

181.    Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the market for Crop Inputs, in violation of Mich. Comp. Laws Ann. § 445.772 (West), *et seq.*

182.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in Michigan, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

183.    Members of the Classes who purchased Crop Inputs in Michigan were harmed by Defendants' anticompetitive conduct in a manner that the Michigan Antitrust Reform Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Michigan suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Michigan are also entitled to all other forms of relief,

- 40 -

including actual damages, treble damages for flagrant violations, interest, costs, and reasonable attorneys' fees and costs.

## COUNT XIII: Minnesota Antitrust Law of 1971
### Minn. Stat. Ann. § 325D.49 (West), *et seq.*

184.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

185.   The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination, or conspiracy, wherever created, formed or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power, whenever any of these affect Minnesota trade or commerce.

186.   Members of the Classes purchased Crop Inputs within the state of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

187.   Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the market for Crop Inputs within the intrastate commerce of and outside of Minnesota; established, maintained, used, or attempted to establish, maintain, or use monopoly power over the trade or commerce in the market for Crop Inputs within the intrastate commerce of and outside of Minnesota; and fixed prices for Crop Inputs within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. Ann. § 325D.49 (West), *et seq.*

188.   Defendants' unlawful conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

189.     Members of the Classes who purchased Crop Inputs in Minnesota were harmed by Defendants' anticompetitive conduct in a manner that the Minnesota Antitrust Law of 1971 was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Minnesota have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Minnesota are also entitled to all other forms of relief, including actual damages, treble damages, costs and disbursements, and reasonable attorneys' fees.

### COUNT XIV: Mississippi Antitrust Laws
### Miss. Code Ann. § 74-21-1, *et seq.*

190.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

191.     Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians.

192.     Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity.

193.     Members of the Classes purchased Crop Inputs within the state of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

194.     Defendants combined, contracted, understood and agreed in the market for Crop Inputs, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Crop Inputs, and hindering competition in the sale of Crop Inputs, in violation of Miss. Code. Ann. § 75-21-1(a) (West), *et seq.*

195.     Defendants monopolized or attempted to monopolize the production, control or sale of Crop Inputs, in violation of Miss. Code. Ann. § 75-21-3 (West), *et seq.*

196.     Defendants' Crop Inputs are sold throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

197.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

198.     Members of the Classes who purchased Crop Inputs in Mississippi were harmed by Defendants' anticompetitive conduct in a manner that Mississippi's antitrust laws were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Mississippi have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Mississippi are also entitled to all other forms of relief, including actual damages and a penalty of $500 per instance of injury.

### COUNT XV: Nebraska Junkin Act
### Neb. Rev. Stat. Ann. § 59-801 (West), *et seq.*

199.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

200.     Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

201.     Members of the Classes purchased Crop Inputs within the state of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

202.     Defendants contracted, combined, or conspired in restraint of trade or commerce of Crop Inputs within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for Crop Inputs within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. Ann. § 59-801 (West), *et seq.*

203.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

204.     Members of the Classes who purchased Crop Inputs in Nebraska were harmed by Defendants' anticompetitive conduct in a manner that Nebraska's Junkin Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Nebraska have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Nebraska are also entitled to all other forms of relief, including actual

- 44 -

damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees and costs.

## COUNT XVI: Nevada Unfair Trade Practices Act
### Nev. Rev. Stat. Ann. § 598A.010 (West), *et seq.*

205.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

206.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities . . . is necessary to the economic well-being of the citizens of the State of Nevada."

207.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open, and competitive market, and to penalize all persons engaged in anticompetitive practices. Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade.

208.    Members of the Classes, acting as reasonable consumers, purchased Crop Inputs within the state of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

209.    Defendants knowingly and willfully fixed prices for Crop Inputs in Nevada, principally but not exclusively by jointly boycotting entities that would have resulted in price reductions, and monopolized or attempted to monopolize trade or commerce of Crop Inputs within the intrastate commerce of Nevada, constituting a contract, combination, or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.*

210.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in Nevada, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

- 45 -

211.     Members of the Classes who purchased Crop Inputs in Nevada were harmed by Defendants' anticompetitive conduct in a manner that Nevada's Unfair Trade Practices Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Nevada suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Nevada are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

212.     In accordance with the requirements of Nev. Rev. Stat. Ann. § 598A.210(3) (West), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.

## COUNT XVII: New Hampshire Antitrust Statute
### N.H. Rev. Stat. Ann. Tit. XXXI § 356, *et seq*

213.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

214.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade.

215.     Members of the Classes purchased Crop Inputs within the state of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

216.     Defendants fixed prices for Crop Inputs in New Hampshire, principally but not exclusively by jointly boycotting entities that would have resulted in price reductions, and monopolized or attempted to monopolize trade or commerce of Crop Inputs within the intrastate

commerce of New Hampshire, constituting a contract, combination, or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

217.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

218.    Members of the Classes who purchased Crop Inputs in New Hampshire were harmed by Defendants' anti-competitive conduct in a manner that the New Hampshire Consumer Protection Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in New Hampshire have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in New Hampshire are also entitled to all other forms of relief, including actual damages, treble damages for willful or flagrant violations, and reasonable attorneys' fees and costs.

## COUNT XVIII: New Mexico Antitrust Act
### N.M. Stat. Ann. § 57-1-1 (West), *et seq.*

219.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

220.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices.

221.    Members of the Classes purchased Crop Inputs within the state of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

222.     Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for Crop Inputs within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1 (West), *et seq.*

223.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

224.     Members of the Classes who purchased Crop Inputs in New Mexico were harmed by Defendants' anticompetitive conduct in a manner that the New Mexico Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in New Mexico have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in New Mexico are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT XIX: New York Donnelly Act
### N.Y. Gen. Bus. Law § 340 (McKinney), *et seq*

225.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

226.     Article 22 of the New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade, or commerce in New York.

227.    Members of the Classes purchased Crop Inputs within the state of New York during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

228.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Crop Inputs and restrained competition in the free exercise of the conduct of the business of Crop Inputs within the intrastate commerce of New York, in violation of New York's Donnelly Act, N.Y. Gen. Bus. Law § 340 (McKinney), *et seq.*

229.    Defendants' conduct and practices have substantial anticompetitive effects in New York, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

230.    Members of the Classes who purchased Crop Inputs in New York were harmed by Defendants' anti-competitive conduct in a manner that New York's Donnelly Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in New York suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in New York are also entitled to all other forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

### COUNT XX: North Carolina Antitrust Laws
### N.C. Gen. Stat. Ann. § 75-1, *et seq.*

231.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

232.    Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Crop Inputs market, a substantial part of which occurred within North Carolina.

233.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Crop Inputs market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

234.    Defendants' unlawful conduct and practices have substantial anticompetitive effects on North Carolina's trade and commerce, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

235.    Defendants' unlawful conduct offends North Carolina public policy to promote fair competition in all its marketplaces and is otherwise immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

236.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Classes who purchased Crop Inputs in North Carolina were injured in their business or property in a manner that the North Carolina antitrust laws were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in North Carolina have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in North Carolina are also entitled to all other forms of relief, including treble damages.

## COUNT XXI: North Dakota Uniform State Antitrust Act
### N.D. Cent. Code §§ 51-08.1, *et seq.*

237.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

238.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade.

239.    Members of the Classes purchased Crop Inputs within the state of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

240.    Defendants contracted, combined, or conspired in restraint of, or to monopolize trade or commerce in the market for Crop Inputs, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing, or maintaining prices for Crop Inputs, in violation of N.D. Cent. Code Ann. § 51-08.1-02 (West), 03.

241.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

242.    Members of the Classes who purchased Crop Inputs in North Dakota were harmed by Defendants' anticompetitive conduct in a manner that the North Dakota Uniform State Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in North Dakota have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in North Dakota are also

- 51 -

entitled to all other forms of relief, including actual damages, treble damages for flagrant violations, and reasonable attorneys' fees.

**COUNT XXII: Oregon Antitrust Law**
**Or. Rev. Stat. Ann. § 646.705 (West),** *et seq.*

243.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

244.     Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 and 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state."

245.     Members of the Classes purchased Crop Inputs within the state of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

246.     Defendants contracted, combined, or conspired in restraint of trade or commerce of Crop Inputs, and monopolized or attempted to monopolize the trade or commerce of Crop Inputs, in violation of Or. Rev. Stat. Ann. § 646.705 (West), *et seq.*

247.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Oregon, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

248.     Members of the Classes who purchased Crop Inputs in Oregon were harmed by Defendants' anti-competitive conduct in a manner that the Oregon Antitrust Law was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Oregon suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction

- 52 -

ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop

Inputs in Oregon are also entitled to all other forms of relief, including actual damages, treble

damages, reasonable attorneys' fees, and expert witness fees and investigative costs.

### COUNT XXIII: South Dakota Antitrust Statute
### S.D. Codified Laws § 37-1-3.1, *et seq.*

249.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations

set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

250.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade,

monopolies, and discriminatory trade practices.

251.    Members of the Classes purchased Crop Inputs within the state of South Dakota

during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs

would have been lower, in an amount to be determined at trial.

252.    Defendants contracted, combined, or conspired in restraint of trade or commerce

of Crop Inputs within the intrastate commerce of South Dakota, and monopolized or attempted to

monopolize trade or commerce of Crop Inputs within the intrastate commerce of South Dakota,

in violation of S.D. Codified Laws §§ 37-1, *et seq.*

253.    Defendants' unlawful conduct and practices have substantial anticompetitive

effects in South Dakota, including increased prices and costs, reduced innovation, poorer

customer service, and lowered output.

254.    Members of the Classes who purchased Crop Inputs in South Dakota were

harmed by Defendants' anticompetitive conduct in a manner that South Dakota's antitrust laws

were intended to prevent when they paid more for Crop Inputs than they would have paid in a

competitive market. Members of the Classes who purchased Crop Inputs in South Dakota have

suffered and continue to suffer damages and irreparable injury, and such damages and injury will

not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in South Dakota are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## COUNT XXIV: Tennessee Trade Practices Act
### Tenn. Code Ann. § 47-25-101 (West), *et seq.*

255.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

256.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void.

257.    Members of the Classes, acting as reasonable consumers, purchased Crop Inputs within the state of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

258.    Defendants competed unfairly and colluded by meeting to fix prices, principally but not exclusively by jointly boycotting entities that would have resulted in price reductions, and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. § 47-25-101 (West), *et seq.*

259.    Defendants' conduct detailed above violated the Tennessee Trade Practices Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee.

- 54 -

260.     Defendants' unlawful conduct and practices have substantial anticompetitive effect on Tennessee commerce, including increased prices and costs, reduced innovation, poorer customer service, and lowered output. Members of the Classes who purchased Crop Inputs in Tennessee were deprived of free and open competition and paid supra-competitive, artificially inflated prices of Crop Inputs.

261.     Defendants' conduct constitutes an unfair practice under the Tennessee Trade Practices Act because it caused and continues to cause harm to Tennessee consumers, cannot reasonably be avoided by consumers in the state, and is not outweighed by any countervailing benefits to consumer or competition.

262.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes who purchased Crop Inputs in Tennessee were injured in their business or property and suffered and continue to suffer ascertainable loss of money or property, in a manner that the Tennessee Trade Practices Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Tennessee have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Tennessee are also entitled to all other forms of relief, including return of the unlawful overcharges they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

### COUNT XXV: Utah Antitrust Act
### Utah Code Ann. § 76-10-911 (West), *et seq.*

263.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

264.     The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce."

265.     Members of the Classes purchased Crop Inputs within the state of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

266.     Defendants contracted, combined, or conspired in restraint of trade or commerce of Crop Inputs, and monopolized or attempted to monopolize trade or commerce of Crop Inputs, in violation of Utah Code Ann. § 76-10-3101 (West), *et seq.*

267.     Defendants' unlawful conduct and practices have substantial anticompetitive effect in Utah, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

268.     Members of the Classes who purchased Crop Inputs in Utah were harmed by Defendants' anti-competitive conduct in a manner that the Utah Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Utah suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Utah are also entitled to all other forms of relief, including actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

## COUNT XXVI: Vermont Consumer Protection Laws
### Vt. Stat. Ann. tit. 9, § 2451 (West), *et seq.*

269.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

270.     Title 9, Chapter 063 of the Vermont Consumer Protection Laws is "to complement the enforcement of federal statutes and decisions governing unfair methods of competition, unfair or deceptive acts or practices, and anti-competitive practices in order to protect the public and to encourage fair and honest competition."

271.     Defendants fixed prices for Crop Inputs in Vermont, principally but not exclusively by jointly boycotting entities that would have resulted in price reductions, and monopolized or attempted to monopolize trade or commerce of Crop Inputs within the intrastate commerce of Vermont, constituting unfair methods of competition in commerce in violation of Vt. Stat. Ann. tit. 9, § 2451 (West), *et seq.*

272.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Vermont, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

273.     Members of the Classes who purchased Crop Inputs in Vermont were harmed by Defendants' anti-competitive conduct in a manner that the Vermont consumer protection laws were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Vermont suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Vermont are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

### COUNT XXVII: West Virginia Antitrust Act
### W. Va. Code Ann. § 47-18-1 (West), *et seq.*

274.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

275.     Members of the Classes purchased Crop Inputs within the State of West Virginia during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

276.     Defendants made contracts or engaged in a combination or conspiracy with one another, for the purpose of fixing, controlling, or maintaining prices for Crop Inputs, sold in West Virginia in violation of W. Va. Code Ann. § 47-18-3 (West), *et seq.*

277.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in West Virginia, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

278.     Members of the Classes who purchased Crop Inputs in West Virginia were harmed by Defendants' anticompetitive conduct in a manner that the West Virginia Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in West Virginia have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in West Virginia are also entitled to all other forms of relief, including treble damages and reasonable attorneys' fees and costs.

### COUNT XXVIII: Wisconsin Trade Regulations
### Wis. Stat. Ann. § 133.01(1) (West), *et seq*

279.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

280.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster

and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition."

281.     Members of the Classes purchased Crop Inputs within the state of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

282.     Defendants contracted, combined, or conspired in restraint of trade or commerce of Crop Inputs, and monopolized or attempted to monopolize the trade or commerce of Crop Inputs, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. Ann. § 133.01 (West), *et seq.*

283.     Defendants' unlawful conduct and practices have substantial effects in Wisconsin, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

284.     As a direct, foreseeable, and proximate cause of Defendants' unlawful conduct, members of the Classes who purchased Crop Inputs in Wisconsin were harmed in a manner that Wisconsin's trade regulations were intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Wisconsin have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Wisconsin are also entitled to all other forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

285.     Defendants are jointly and severally liable for all damaged suffered by members of the Classes who purchased Crop Inputs in Wisconsin.

# PRAYER FOR RELIEF

Plaintiff, on behalf of itself and the classes of all others so similarly situated, respectfully requests judgment against Defendants as follows:

A.   That the Court certify this lawsuit as a class action under Fed. R. Civ. P. 23(a) and (b)(3), that Plaintiffs be designated as class representatives, that Plaintiffs' counsel of record be appointed as Class counsel, and that the Court direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Classes, once certified;

B.   That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1 (West) and the listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

C.   That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged in the Complaint, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect under Section 16 of the Clayton Antitrust Act, 16U.S.C. § 26;

D.   That the Court award Plaintiffs and the Classes damages against Defendants for their violation of federal and state antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C.A. § 15 (West), plus interest;

E.   That the Court award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

F.   That the Court award Plaintiffs and the Classes pre- and post- judgment interest as provided by law and that such interest be awarded at the maximum rate allowable by law from and after the date of service of this Complaint; and

G.   That the Court direct such other and further relief as the case may require and the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial as to all issues triable by a jury.

May 27, 2021                              Respectfully submitted,

                                          _/s/ Daniel J. Kurowski_____

                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                          Thomas M. Sobol – lead counsel (*Pro Hac Vice*
                                          forthcoming)
                                          Lauren Guth Barnes – lead counsel (*Pro Hac
                                          Vice* forthcoming)
                                          Abbye R. K. Ognibene – lead counsel *(Pro Hac
                                          Vice* forthcoming)
                                          55 Cambridge Parkway, Suite 301
                                          Cambridge, MA 02142
                                          PH: 617-482-3700
                                          FX: 617-482-3003
                                          EM: tom@hbsslaw.com
                                              lauren@hbsslaw.com
                                              abbyeo@hbsslaw.com

                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                          Daniel J. Kurowski (6286656)
                                          455 North Cityfront Plaza Drive, Suite 2410
                                          Chicago, IL 60611
                                          PH: 708-628-4949
                                          FX: 708-628-4950
                                          EM: dank@hbsslaw.com

                                          **THE DUGAN LAW FIRM**
                                          James R. Dugan, II (*Pro Hac Vice* forthcoming)
                                          David S. Scalia (*Pro Hac Vice* forthcoming)
                                          TerriAnne Benedetto (*Pro Hac Vice* forthcoming)
                                          One Canal Place
                                          365 Canal Street, Suite 1000
                                          New Orleans, LA 70130
                                          PH: 504-648-0180
                                          FX: 504-648-0181
                                          EM: jdugan@dugan-lawfirm.com
                                              dscalia@dugan-lawfirm.com
                                              tbenedetto@dugan-lawfirm.com

- 61 -

**MITCHELL A. TOUPS, LTD.**
**WELLER, GREEN, TOUPS & TERRELL,**
**L.L.P.**
Mitchell A. Toups (*Pro Hac Vice* forthcoming)
Post Office Box 350
Beaumont, TX 77704
PH: 409-832-1800
FX: 409-832-8577
EM: matoups@wgttlaw.com

**HACH ROSE SCHIRRIPA & CHEVERIE**
**LLP**
Frank R. Schirripa (*Pro Hac Vice* forthcoming)
Seth M. Pavsner (*Pro Hac Vice* forthcoming)
112 Madison Avenue, 10th Floor
New York, NY 10016
PH: 212-213-8311
EM: fschirripa@hrsclaw.com


**CHEHARDY SHERMAN WILLIAM, LLP**
James Williams (*Pro Hac Vice* forthcoming)
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH: 504-833-5600
FX: 504-833-8080
EM: jmw@chehardy.com

*Attorneys for Plaintiff and the proposed classes*